UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rand-Heart of New York, Inc.,                    Civ. No 14-3011 (PAM/HB)
Micheal Rodolico, Ian Henderson,
Antonino Floridia, Matthew Dudevoir,
David Hall, and Tammy Hall,
individually and on behalf of all
others similarly situated,

                        Plaintiffs,

v.                                        **MEMORANDUM AND ORDER**

James P. Dolan and Vicki J.
Duncomb,

                        Defendants.

_____

This matter is before the Court on Defendants' Motion to Dismiss.  For the reasons

that follow, the Motion is granted.

**BACKGROUND**

Defendants James Dolan and Vicki Duncomb were officers of The Dolan Company,

a Minneapolis-based company specializing in professional services and business information.

(Am. Compl. (Docket No. 61) ¶¶ 12, 20-22.)  Dolan served as President, Chief Executive

Officer, and Chairman of the company's Board of Directors.  (Id. ¶ 21.)  Duncomb was the

company's Chief Financial Officer.  (Id. ¶ 22.)  The company's businesses included

mortgage default processing as well as a litigation support business called DiscoverReady.

(Id. ¶ 20.)  The performance of the DiscoverReady business is the focus of this putative

securities fraud class action lawsuit, brought by investors who purchased Dolan Company

stock during the period August 1, 2013, to January 2, 2014.  There is no dispute that, both before and during the class period, the company as a whole was in rather dire financial circumstances, largely as a result of the company's substantial debt in addition to the housing market's improvement and subsequent decrease in mortgage-foreclosure-related business. (Wildung Aff. Ex. 2 (2012 10-K) at 70.)

DiscoverReady "provide[d] discovery management and document review services, including technology services related to processing and hosting discovery data."  (Am. Compl. ¶ 26.)  Although DiscoverReady served a variety of clients, its biggest customer was Bank of America.  (Id. ¶ 88.)  Business from Bank of America comprised 20% to 30% of DiscoverReady's revenues in any given quarter.  (Id.)  In late June or early July of 2013, Bank of America became concerned about Dolan Company's overall finances.  (Id. ¶ 58.)  Dolan and Scott Pollei, who was the company's Chief Operating Officer (id. ¶ 47 n.1), met with Bank of America representatives.  (Id.)  Pollei stated that it was his "impression" and "understanding" after this meeting that, in order for Bank of America to continue to send work to DiscoverReady, the company would need to solve its financial problems.  (Id. (citing Pollei's testimony at company's May 30, 2014, bankruptcy hearing).)  In addition to Bank of America's threats to curtail its assignment of work to DiscoverReady, Bank of America also declined to enter into a co-location agreement, through which DiscoverReady would place some of its computer servers in the same location as Bank of America's servers.  (Id. ¶ 59.)  Sometime in July 2013, the Board authorized Pollei to begin to seek buyers for the DiscoverReady business.  (Id. ¶¶ 50-51.)

On August 1, 2013, the company issued a press release announcing its second-quarter results for 2013, as well as its Form 10-Q report to the SEC for the second quarter.  Plaintiffs challenge multiple statements from the press release and the 10-Q (id. ¶ 68, 70, 72, 74), claiming that each was materially false and misleadingly incomplete, because none of the statements informed the public about "the deterioration of the Company's relationship with Bank of America . . . ." (E.g., id. ¶ 75.)  Also on August 1, 2013, Dolan and Duncomb held a conference call with securities analysts.  Plaintiffs contend that many of the statements each Defendant made during that conference call were materially false and misleading, for the same reason noted above.  (Id. ¶¶ 78-79.)  Plaintiffs contend that the company's stock value was inflated after the August 1, 2013, announcement of second-quarter results, because of the "positive statements about [the company's] business, operations, and liquidity [that] were materially false and misleading and incomplete and lacked a reasonable basis." (Id. ¶ 94.) The company's share price, which had traded at $2.54 per share on July 31, 2013, fell to $2.39 per share on August 1, and lost an additional 10 cents per share the next day. (Wildung Ex. 15.)  By late August, the share price was near $2 per share.  (Id.)

On November 12, 2013, the company announced its third-quarter financial results, which were far less encouraging than the second-quarter results.  (Am. Compl. ¶ 83.)  In particular, the company's revenues decreased nearly 21% from the third quarter of the previous year. (Id.) Although Dolan's press release accompanying the results announcement noted that DiscoverReady's revenue decreased 28% during the quarter "as a result of a period of reduced work from DiscoverReady's largest customer," Dolan also stated that the

3

company "remain[ed] encouraged by the opportunity and growth potential within the e-discovery market."  (Id.)  The company issued its Form 10-Q on the same day, stating that revenues in DiscoverReady decreased because of a reduction in work from DiscoverReady's largest customer.  (Id. ¶ 89.)  The 10-Q also noted that the "reduction resulted from the customer's evaluation of the Company's overall financial condition."  (Id.)

Although company shares had traded as high as $2.99 per share in mid October 2013 (id. ¶ 120), after the November 12 announcements the share price fell from $2.08 to $1.05, or 49.5%.  At least two of the Plaintiffs, including lead Plaintiff Rand-Heart, purchased their shares after the November 12 announcements. (Docket No. 34-2 (Rand-Heart's certification, listing purchases on Dec. 2 and 3, 2013); 1-1 (Floridia's certification, listing purchases beginning Nov. 25, 2013 and continuing into December).)  The company's share price continued to decline throughout December 2013, with a price of $0.69 per share before trading opened on January 2, 2014, the last day of the class period.  (Am. Compl. ¶ 98.)

On January 2, 2014, the company announced that it had appointed a "Chief Restructuring Officer" to attempt to restructure the company's indebtedness.  (Id. ¶ 97.)  In the same announcement, the company stated that the New York Stock Exchange had issued a continued listing standards notice to the company because the company's share price had been below $1.00 per share for more than one month.  (Id.)  After this announcement, the share price declined by $0.14, or nearly 21%, to close at $0.55 per share.  (Id. ¶ 98.) The company ultimately filed for bankruptcy protection on March 23, 2014.  (Id. ¶ 99.)

As discussed briefly above and in more detail below, Plaintiffs contend that

Defendants made a series of false and misleading statements during the class period.  The

Amended Complaint alleges violations of §§ 10(b) and 20, and Rule 10b-5, of the Securities

and Exchange Act of 1934.  15 U.S.C. §§ 78j(b) and 78t(a); 17 C.F.R. § 240.10b-5.  Section

10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any

security . . ., any manipulative or deceptive device or contrivance in contravention of such

rules and regulations as the Commission may prescribe . . . ."  15 U.S.C. § 78j(b).  Rule 10b-

5 quantifies the conduct proscribed by section 10(b), making it illegal

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 20 imposes liability on a person who controls an entity that

engages in the practices proscribed by section 10(b) and rule 10b-5.

## DISCUSSION

### A.    Standard of Review

Generally, a Rule 12(b)(6) motion requires the court to assume all factual allegations

in the complaint as true, and to grant plaintiffs all reasonable inferences that may be drawn

from the complaint.  Fed. R. Civ. P. 12(b)(6); In re Navarre Corp. Sec. Litig., 299 F.3d 735,

741 (8th Cir. 2002).  However, when Congress adopted the Private Securities Litigation

Reform Act ("PSLRA"), it heightened the Rule 12(b)(6) pleading standards for securities

fraud class action claims.  Id.; see 15 U.S.C. §§ 78j, 78t(a); 17 C.F.R. § 240.10b-5.  The

PSLRA was designed to encompass at the very least Rule 9(b) pleading standards.  Kushner

v. Beverly Enter., Inc., 317 F.3d 820, 826 (8th Cir. 2003).

In order to proceed on claims brought under 10(b) and Rule 10b-5, Plaintiffs are

required to allege four elements: (1) misrepresentations or omissions of material fact or acts

that operated as fraud or deceit in violation of the rule; (2) causation, often analyzed in terms

of materiality and reliance; (3) scienter; and (4) economic harm caused by the fraudulent

activity occurring in connection with the purchase and sale of a security.  In re K-Tel Int'l

Sec. Litig., 300 F.3d 881, 888 (8th Cir. 2002).  The Complaint must specify each misleading

statement or omission and specify why the statement or omission was misleading.  15 U.S.C.

§ 78u-4(b)(1); Kushner, 317 F.3d at 826.  It must also "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.

§ 78u-4(b)(2); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007) ("[T]he

inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be

cogent and compelling, thus strong in light of other explanations."); see also  Navarre, 299

F.3d at 741 ("[I]nferences of scienter survive a motion to dismiss only if they are both

reasonable and 'strong' inferences").  The PSLRA's "heightened pleading standard does not

amount to an obligation on securities fraud plaintiffs to ultimately prove their allegations, as

that 'is an altogether different question' from adequately pleading securities fraud."  IBEW

Local 98 Pension Fund v. Best Buy Co., 958 F. Supp. 2d 1065, 1072 (D. Minn. 2013) (Frank,

J.) (quoting Matrixx Initiatives Inc. v Siracusano, 131 S. Ct. 1309, 1325 (2011)).

**B.     Section 10(b) and Rule 10b-5 Claims**

Defendants claim that Plaintiffs have failed to comply with the PSLRA in several ways.  First, they contend that Plaintiffs' allegations regarding the alleged misleading statements are insufficient.  Second, they assert that Plaintiffs have not sufficiently alleged scienter.  Finally, they contend that Plaintiffs' causation allegations are insufficient as to the company's January 2, 2014, statement regarding restructuring.

1.     Misrepresentations/Omissions

The Amended Complaint must specify each false statement or misleading omission and explain why the statement was misleading.  15 U.S.C. § 78u-4(b)(1).  Moreover, any misleading statement or omission must be material, that is, there must be "a substantial likelihood that the disclosure of the [] fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).  "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. . . . Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose . . . by controlling what they say to the market."  Matrixx, 131 S. Ct. at 1321-22.

Plaintiffs challenge the company's release of information on three different occasions: August 1, 2013, November 12, 2013, and January 2, 2014.  The Court will address the alleged misrepresentations and omissions made on each date together.

a.    August 1, 2013

The company released its second-quarter results, issued a press release regarding those results, and released its second-quarter 10-Q on this date.   In addition, Dolan had a conference call with stock analysts.  Plaintiffs challenge the following statements in the press release:

- ▸    Recent operating trends continued in the second quarter, as our e-discovery business posted very strong growth.

- ▸    We saw balanced demand for both our document review and technology processing segments within the e-discovery business.

- ▸    On a sequential basis, DiscoverReady revenues grew by 18% as we saw strong demand from existing clients while continuing to develop and grow a broad pipeline of new clients.

(Am. Compl. ¶ 68.)  Plaintiffs contend that these statements were "materially false and misleading and omitted material facts" because the company did not disclose that its "relationship with existing client Bank of America had deteriorated and Bank of America had expressed concerns regarding the [c]ompany's financial condition."  (Id. ¶ 69.)

But the statements about the company's second-quarter financial results were undoubtedly true:  DiscoverReady posted strong results, and Plaintiffs do not assert that the financial information was overstated in any way.  Plaintiffs' theory, instead, is that by failing to warn the market about DiscoverReady's likely lower third quarter results, the statements regarding the business's second-quarter results were misleading.

A company does not "undertake a duty to speak about . . . problems [] solely by reporting historical financial results." Public Pension Fund Grp. v. KV Pharma Co., 679 F.3d

972, 984 (8th Cir. 2012). Indeed, the statute requires that a company "provide complete and non-misleading information . . . not [that it] dump all known information with every public announcement." In re K-Tel, 300 F.3d at 898 (citation omitted). The challenged statements from the August 1, 2013, press release are not misleading as a matter of law and Plaintiffs cannot raise a securities fraud claim against those statements.

Plaintiffs also challenge three statements from the August 1, 2013, 10-Q:

- ▸ The Company's ability to generate sufficient cash flows in 2013 has been negatively impacted by the business challenges in its mortgage default foreclosure and public notice business.

- ▸ The Company has one litigation support services customer, a large financial services company, which accounted for 30.5% and 27.5% of the Company's total revenues for the three and six months ended June 30, 2013, respectively.

- ▸ The increase in litigation support services revenues was driven by an increase in review work and technology services from existing customers.

(Am. Compl. ¶¶ 70, 72, 74.) The last two challenged statements are, as above, reports of past financial results or a discussion of the reason for those results. These factual, undeniably true reports are not actionable.

Plaintiffs contend that the first statement was incomplete and misleading because the company knew that the deterioration of its relationship with Bank of America would "create[] liquidity pressures on the Company, ultimately necessitating its filing for bankruptcy protection and its restructuring." (Id. ¶ 71.) Again, however, the 10-Q's statement regarding the company's difficulty generating cash flow in 2013 was backward-

looking.  In other words, it is a statement of historical fact, not a forecast for the future.  It may be that the company suspected increased liquidity pressure in the third quarter because of the issues with Bank of America, but the challenged statement was reporting on the company's results for the second quarter.  There is no allegation that the Bank of America situation had any effect on the company's liquidity in the second quarter.  Thus, this statement is also not actionable.

Finally, Plaintiffs challenge a number of statements Dolan and Duncomb made during a conference call with analysts regarding the second-quarter results:

- ▸ For 2013, we expect both DiscoverReady and the Litigation Support segment to grow at double-digit rates over the prior year with positive EBITDA leverage.

- ▸ We make this comment [that DiscoverReady's third-quarter revenues will be below the previous year's] not to dampen enthusiasm about our growth prospects for DiscoverReady, but to set proper expectations for a business that may experience lumpiness[1] on a quarter-to-quarter basis.

- ▸ Our second quarter financial results reflect meaningful improvement in DiscoverReady, our e-discovery business compared to last year.

- ▸ We are encouraged that we will [be] able to focus much more on our DiscoverReady growth engine . . . .

(Am. Compl. ¶ 78.)  In addition, when questioned by an analyst regarding his "lumpiness" comment, Dolan stated that, although it did not appear that DiscoverReady's third- and

---

[1] The Amended Complaint describes "lumpiness" as "just a question of timing," a not-particularly-elucidating definition of this rather opaque bit of business-speak.  (Am. Compl. ¶ 80.)  Plaintiffs' Opposition Memorandum defines it a bit more helpfully as the clustering of revenue in particular periods.  (Pls.' Opp'n Mem. (Docket No. 73) at 14.)

fourth-quarter results would be as strong as its results from the same period in 2012, he could not be "very specific about the lumpiness now without getting into details we normally do not disclose." (Id.) Dolan finished his statement by saying, "[G]iven the lack of board visibility on this kind of business, we have to be cautious in how we describe things." (Id.) Plaintiffs appear to challenge only this final statement, albeit in the context of Dolan's entire answer to the analyst's question.

According to Plaintiffs, "[d]escribing DiscoverReady as a 'growth engine' that had contributed to 'meaningful improvement' misleadingly concealed the deterioration of its relationship with Bank of America . . . ." (Id. ¶ 79.)  But these two statements cannot be conflated:  the first, regarding DiscoverReady's "meaningful improvement," came from Duncomb.  The second, calling DiscoverReady a "growth engine," came from Dolan. Duncomb's statement is a statement of historical results.  DiscoverReady did post improved financial results in the second quarter of 2013, compared to the second quarter of 2012.  This statement is therefore not actionable, for the reason discussed above.  And Dolan's characterization of DiscoverReady as a "growth engine" merely repeats statements from the company's previous results releases and is, in any event, "so vague and such obvious hyperbole that no reasonable investor would rely on [it.]" Parnes v. Gateway 2000, 122 F.3d 539, 547 (8th Cir. 1997).

The first two challenged statements, however, are not statements regarding historical results.  Rather, they are discussions of future results.  "'[A] party who discloses material facts in connections with securities transactions assume[s] a duty to speak fully and truthfully

on those subjects.'"  In re K-Tel, 300 F.3d at 898 (quoting Helwig v. Vencor, Inc., 251 F.3d 540, 561 (6th Cir. 2001)) (overruled on other grounds by Tellabs, 551 U.S. 308).  While it may have been true that DiscoverReady would post revenues for all of 2013 that were higher than those earned in 2012, Duncan knew at this time that DiscoverReady would experience a sharp decline in revenues in the third quarter, because Bank of America had already stopped sending much of its work to DiscoverReady.  Moreover, Plaintiffs point out that the "lumpiness" about which Dolan spoke was not the normal clustering of revenue in certain quarters due to the cyclical nature of the business, but rather would be a severe decline in DiscoverReady's financial results in the third quarter due almost solely to the undisclosed Bank of America situation.  (Am. Compl. ¶ 80.)

Defendants contend that these statements are forward-looking and thus cannot be actionable under the PSLRA's safe harbor for forward-looking statements. 15 U.S.C. § 78u-5(c)(1)(A)-(B).  But even according to Defendants' own authority, forward-looking statements are insulated from liability only when accompanied by "meaningful cautionary language." (Defs.' Supp. Mem. (Docket No. 65) at 16 (citing, inter alia, Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 795 (11th Cir. 2010)).  According to Defendants, the conference call began with a cautionary statement to listeners that "further information about risks and uncertainties were contained in the 'risk factor and forward-looking statement sections' of the Company's SEC filings." (Id. (quoting 2Q13 Earnings Call, Ex. 11 at 1.)  Among other warnings, these filings warned investors about DiscoverReady's reliance on a single customer for much of its revenue. (Wildung Aff. Ex.

2 (2012 10-Q) at 22.)  Thus, Defendants argue, the safe harbor applies.

Whether such general cautionary language is "meaningful," is, however, something that the Court cannot determine at this preliminary stage.  The Court must accept Plaintiffs' plausible allegations, and Plaintiffs have plausibly alleged that these two statements Dolan made during the conference call were materially misleading and incomplete.  The allegations in the Amended Complaint are that Dolan knew as of August 1, 2013, that DiscoverReady's third-quarter revenues would sharply decline, and that this decline was not merely cyclical "lumpiness."  Thus, Plaintiffs have succeeded in pleading the first element of their securities fraud claim with respect to these two statements.  See Elam v. Neidorff, 544 F.3d 921, 927 (8th Cir. 2008) (securities fraud complaint must point to "contemporaneous reports, witness statements, or any [other] information that had actually been provided to defendants" at the time they were alleged to have made the material misrepresentations or omissions).

   b.   November 12, 2013

On November 12, 2013, the company released its third-quarter results.  This release included a press release, a 10-Q, and a conference call with analysts.  Plaintiffs challenge the following statements from the press release, all of where were attributed to Dolan:

> ▸ Meanwhile, we experienced some challenges in our Litigation Support Services segment in the third quarter.  Revenues for this segment decreased by 28% during the quarter, including a 33% decline at DiscoverReady, our e-discovery business.  I should  point out that DiscoverReady's third quarter is compared against a record third quarter last year.  Through the first three quarters of 2013, DiscoverReady is up 14%, which is consistent with our previous guidance.

▸　　DiscoverReady's third quarter revenues were affected not only by the quarterly lumpiness that is inherent to the e-discovery business, but also decreased primarily as the result of a period of reduced work from DiscoverReady's largest customer.  Despite these near-term challenges, we remain encouraged by the opportunity and growth potential within the e-discovery market.

(Am. Compl. ¶ 83.)  Again, Plaintiffs contend that these statements "misleadingly concealed the deterioration of its relationship with Bank of America and Bank of America's concerns, developments so dramatic, they necessitated the Company's restructuring."  (Id. ¶ 84.)

The second challenged statement, however, is undoubtedly true, and indeed tells investors what Plaintiffs contend Defendants omitted to state:  that DiscoverReady's largest customer had reduced the amount of work it sent to DiscoverReady.  What Plaintiffs take issue with is not the statement itself but the details the statement omits and the generally positive tone of Dolan's statements.

Given the fact that the company's stock price plummeted nearly 50% after the November 12, 2013, release of the company's third-quarter results, it is difficult to say that the market needed more information regarding DiscoverReady's difficulties.  Thus, any omission was not materially misleading—it did not "significantly alter[] the total mix of information made available."  Matrixx, 131 S. Ct. at 1321 (quotations omitted; emphasis in Matrixx).  The first sentence of the second challenged statement above is not actionable.

Nor is the second sentence of that statement actionable.  Dolan's statement that he "remain[s] encouraged by [DiscoverReady's] opportunity and growth potential" is just the sort of "vague statement[] predicting growth" that is not actionable because it is mere

puffery.  <u>Parnes</u>, 122 F.3d at 547.

Although the Amended Complaint appears to challenge the entirety of the first statement quoted above, it is clear that Plaintiffs in fact take issue only with the final two sentences, in which Dolan attempts to soften the sharp decline in DiscoverReady's third-quarter results by pointing out that the results were compared to the business's record revenue in the third quarter of 2012, and that the results were still within the company's predictions for the year.

These statements are true:  DiscoverReady experienced record revenues in the third quarter of 2012, against which nearly any other quarter would pale, and the 2013 year-to-date results were still within the range predicted.  Plaintiffs essentially argue that, in attempting to justify the weaker-than-previous-year's results, Dolan misled investors into thinking that the business's future was rosy.  But again, the market was not misled.  Even if Dolan's failure to provide information regarding the Bank of America situation was an omission, it was not material and it caused no loss, and thus also fails at the loss-causation step of the analysis.  Plaintiffs have not established that any of the statements from the November 2, 2013, press release are actionable under § 10(b) or Rule 10b-5.

Plaintiffs next challenge the following statements Dolan made during a conference call with analysts:

> ▸ This [decline in DiscoverReady's revenues] was a result of a reduction in new work from our largest customer, a reduction that we identified towards the end of the quarter.

> ▸ Fortunately, DiscoverReady has a very strong relationship with the

customer and a long track record of excellent customer service.

(Am. Compl. ¶ 85.)  Again, Plaintiffs contend that these statements were misleading because they concealed the Bank of America situation from investors.  (Id. ¶ 86.)

The first statement is true, but Plaintiffs again assert that it omits information and is therefore misleading.  As with the statements discussed above, however, Dolan's comment on DiscoveryReady's revenue decline is not misleading.  Indeed, the sentence following the one Plaintiffs challenge states, "We believe this resulted from a customer's evaluation of The Dolan Company's overall financial condition."  (Id. ¶ 85.)  These statements, taken together, simply could not mislead any reasonable investor regarding the reason for the decline in revenues.

And the second challenged statement is, at best, puffery.  Neither of the challenged statements during the November 12, 2013, conference call are actionable.

Finally, Plaintiffs challenge three statements in the November 12, 2013, 10-Q.  Two of the challenged statements are nearly identical to those challenged in the August 1, 2013, 10-Q:

> ▸ The Company's ability to generate sufficient cash flows in 2013 has been negatively impacted by the business challenges in its mortgage default foreclosure and public notice business.

> ▸ The Company has one litigation support services customer, a large financial services company, which accounted for 23.6% and 28.6% of the Company's total revenues for the three and nine months ended September 30, 2013, respectively.

> ▸ Our professional services revenues decreased primarily as a result of decreased revenues in our litigation support segment.  Revenues in this

16

> segment decreased primarily as a result of a reduction in new work from DiscoverReady's largest customer.  We believe this reduction resulted from the customer's evaluation of the Company's overall financial condition.

(Am. Compl. ¶¶ 87-89.)  As discussed in more detail above, the second statement is one of historical fact and is not actionable.  The third statement is true and is not materially misleading, for the reasons discussed in the previous paragraphs.

The first challenged statement is identical to one of the statements Plaintiffs challenged with respect to the second-quarter 10-Q.  Although the statement was not incomplete or misleading as a reporting of second-quarter results, the fact that the company pointed only to its mortgage default foreclosure and public notice businesses as responsible for liquidity issues is more troubling for the third quarter 10-Q, when it is beyond dispute that the company was feeling the effects of the Bank of America situation.  But in light of the other statements in the 10-Q, statements that made clear that Bank of America had reduced the work it was sending to DiscoverReady and Bank of America's concerns about the financial health of the company, this rather innocuous (and likely overlooked-from-previous-editions) statement did not "significantly alter the total mix of information" available to investors, and is therefore not actionable.

Plaintiffs have failed to establish that any of the challenged November 12, 2013, statements are material misrepresentations or omissions actionable under the securities laws.

c.      January 2, 2014

Plaintiffs allege that, even with the November 12, 2013, revelations regarding Bank

of America and the subsequent 50% reduction in stock price, the company's stock price "remained artificially inflated to a material degree" until the disclosures the company made on January 2, 2014. (Am. Compl. ¶ 95.) This allegation is somewhat puzzling, given that, during November and December 2013, the stock price continued to decline, losing more than 30% of its value between November 12, when it closed at $1.05, and January 2, when it was valued at $0.69. The fact that the stock lost an additional 14 cents after the January 2 announcement regarding the company's restructuring is not as significant when compared with the 30% tumble in value during the preceding six weeks.

Plaintiffs do not contend that any of the statements the company made on January 2, 2014, were misleading. Rather, this is the date when, according to Plaintiffs, Defendants' fraudulent misrepresentations and omissions were finally revealed and the market knew the truth about the financial health of the company. Thus, January 2, 2014, is the last day of the putative class period.[2]

> d.   Conclusion

Plaintiffs have plausibly pled a material misrepresentation or omission with respect to only two statements, both statements Dolan made in the August 1, 2013, conference call

---

[2] Given the conclusion that Plaintiffs have failed to allege any actionable securities fraud with respect to any November 12, 2013, statements, it is likely that Defendants are correct that the class period should end on November 12, 2013, not January 2, 2014. By November 12, the market had all the information it needed about the company's financial struggles and the reasons therefor. However, given the Court's ultimate conclusion regarding the viability of Plaintiffs' claims, it is unnecessary for the Court to re-define the class period.

with analysts.  The remainder of their allegations are insufficient as a matter of law and will

be dismissed.  In addition, because Duncomb had no part in the statements Dolan made

during that conference call, Plaintiffs have not plausibly alleged either a fraud claim or a

control-person claim as to Duncomb, and she will likewise be dismissed.

    2.    <u>Scienter</u>

To prove that a defendant violated § 10(b) or Rule 10b-5, a plaintiff must establish

that the defendant "acted with scienter, 'a mental state embracing intent to deceive,

manipulate, or defraud.'" <u>Tellabs</u>, 551 U.S. at 319 (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425

U.S. 185, 193-94 & n.12 (1976)).  The PSLRA provides the framework for this scienter

requirement at the motion-to-dismiss stage, requiring securities-fraud plaintiffs to "state with

particularity facts giving rise to a strong inference that the defendant acted with the required

state of mind." 15 U.S.C. § 78u-4(b)(2).  The Supreme Court has counseled that a "strong

inference" of scienter need not be the most plausible inference, but it must be "at least as

compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs</u>, 551

U.S. at 324.  Because only two of Dolan's statements are potentially actionable, the Court

will examine Plaintiffs' allegations regarding scienter only with regard to Dolan and these

statements.

Defendants emphasize Dolan's alleged lack of motive to put forward false

information, noting that he did not sell any of his shares of the company during the putative

class period and thus lost millions of dollars.  But while "personal financial gain may weigh

heavily in favor of a scienter inference, . . . the absence of a motive allegation is not fatal."

Id. at 325.

Plaintiffs' scienter allegations are few:  according to the theory espoused in the Amended Complaint, Dolan was "motivated to issue materially false and misleading statements to increase the aggregate revolving commitment of [the company's] credit facility that was amended on July 9, 2013." (Am. Compl. ¶ 116.)  Plaintiffs theorize that, had the company's creditors been aware of the Bank of America situation, "they would have called for termination of the credit facility and/or denied the increase in the in the [sic] aggregate revolving commitment."  (Id. ¶ 117.)  The Amended Complaint does not specify when the company hoped to increase its credit facility's aggregate revolving commitment.  The only date listed is July 9, 2013, when the company apparently successfully amended its credit facility, but this date is well before any of the statements challenged in the Amended Complaint and thus cannot support Plaintiffs' scienter allegations.

Plaintiffs' opposition memorandum offers a new motive for Dolan to make the allegedly misleading statements: he wanted buyers to believe that DiscoverReady was worth more than it really was. (Pls.' Opp'n Mem. at 19.)  Plaintiffs contend that, once the Bank of America situation came to light in November 2013, the offering price for DiscoverReady fell by $100 million.  (Id. at n.17.)  As Defendants argue, however, this new motive is not plausible, much less cogent or compelling.  Although initial bids for DiscoverReady may have been inflated because of the alleged misleading statements, any buyer would soon have learned that DiscoverReady was suffering from Bank of America's work reduction.  A buyer does not simply write out a check for a business—there is much due diligence performed,

including a thorough review of the business's financial statements.  Dolan could not have reasonably believed that his allegedly misleading statements regarding the financial health of DiscoverReady would lead a buyer to pay a higher price for the business than it was worth.

In short, Plaintiffs have not met their burden to plead a strong inference of scienter with respect to Dolan's alleged omissions.  Thus, their claims as to the two remaining statements also fail.

## C.    Section 20 Claims

Because Plaintiffs' § 10(b) and Rule 10b-5 claims as to Dolan and Duncomb fail, there is no basis to impose liability on Defendants under § 20.  This claim must likewise be dismissed.

## CONCLUSION

Plaintiffs have failed to establish that most of the statements they challenge were false or misleading or omitted material information, and have failed to establish scienter with respect to the only two plausibly pled misleadingly false statements.  Accordingly, **IT IS HEREBY ORDERED that**:

1.    Defendants' Motion to Dismiss (Docket No. 63) is **GRANTED**; and

2.     The Amended Complaint (Docket No. 61) is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   March 25, 2015

                                  *s/Paul A. Magnuson*
                                  Paul A. Magnuson
                                  United States District Court Judge